Case 14-5879, Alicia Pedreira et al. v. Sunrise Childrens Services et al. Oral argument, 15 minutes per side. Mr. Scheller for the appellant. Good morning, Your Honors. John Scheller for the appellant, Sunrise. I'd like to reserve three minutes, please. You may. Thank you. My client, Sunrise, is a nonprofit charitable organization that provides food, shelter, housing, education, medical services for abused and neglected children all through the state of Kentucky. It's appealing this case from the order of the district court for two fundamental reasons. Two fundamental reasons why that order should be vacated and the case remanded for dismissal or a ruling on our summary judgment motion. The first is standing, which is a matter of subject matter jurisdiction. And the second is the court's error in entering the order that it did, disposing of the case while our motion for summary judgment was pending and had been pending for some 20 months at the time that order was entered. As this court is no doubt well aware, in the last 10 years or so, the Supreme Court has said repeatedly to the lower courts, admonished them to be rigorous about subject matter jurisdiction and rigorous about standing in particular. The most recent case on that point by the Supreme Court in the context of an Establishment Clause case like we have here is the Arizona v. Wynn case. And if you'd bear with me, I'd like to make a brief quote from that case because it's very apt. It says, in an era of frequent litigation, class action, sweeping injunctions with prospective effect, and controlling jurisdiction and continuing jurisdiction to enforce judicial remedies, courts must be more careful to insist on the formal rules of standing, not less so, unquote. That describes this case to a T. That describes the lower court's order to the T. We're talking about taxpayer standing now. We are talking about taxpayer standing in the context of an Establishment Clause case. And, of course, taxpayer standing is the most limited, the most narrow form of standing there could ever be. It's a very, very narrow exception to the general rule that taxpayers never have standing. Well, and, I mean, before we go into sort of, you know, first principles about taxpayer standing, obviously a panel of our court in a published decision said the plaintiffs have standing, taxpayer standing, to bring this Establishment Clause claim, right? Binding precedent absent, the Supreme Court bringing down new authority that invalidates it. I guess your argument is, well, that Winn case requires the nexus determination in addition to the first prong of FLAST, right? Correct. But our panel did make a nexus determination. So, you know, I don't know how thin you're asking us to slice this, but we have a panel that made the very determination you're saying was necessary. It's more than just the Winn case. I think it's important to understand that the Supreme Court has said over and over again, standing is not dispensed in gross. I know, but the first panel knew all these, you know, almost platitudes of standing. Well, what I'm suggesting, though, is that we have a different case than we did in 2005. Because of the different stage of the case? It's a different stage of the case. The Supreme Court says that you have to reevaluate standing. That's correct. Lujan says you look at, you know, there's a different showing necessary. But this case doesn't really seem, it doesn't seem to make much difference here. Correct me if I'm wrong, okay? They're pointing to a resolution by the Kentucky House that post-enactment that seemed to, that commended your client for their work. And they're pointing to basically an earmark that was also post-enactment. And those two things aren't, I mean, those are the two things that give rise to the nexus, according to our panel decision, right? According to the panel decision, yes. At the stage where you were assuming the plaintiff's version of the facts were true because you were at the 12 v. 1 stage. But those facts are not going to change. Unlike a case where there might just be an allegation, you know, like Lujan, that I have every intention of going to a particular country to see the wildlife there. Allegation in a pleading is good enough at the 12 v. 6 stage. Now we're at summary judgment. Let's take a deposition and really find out whether you intended to go to that country. The evidence changes in that kind of, those kinds of factual allegations. Here, we're not going to have a trial about whether this Kentucky resolution happened, whether the earmark happened. That's a static thing, and that has not, that is the basis of taxpayer standing according to the earlier panel. That has not changed one iota from the earlier stage to this one. So it just doesn't seem to matter unless I'm missing something. With respect, I think you are. First of all, that's where Winn comes in and repudiates both prongs of the Perdura panel's decision. And in addition to that, because it said not only does state and federal taxpayer standing operate the same way on stage one of FLAST, it has to operate the same way on stage two of FLAST. And this panel, or not this panel, but the earlier panel, didn't apply the nexus test the same way. It didn't look at the spending legislation, which is really the impetus for taxpayer standing. It looked at these other legislative actions that didn't have anything to do with the spending legislation being challenged. I'd also point out, Your Honor, that the original panel dealt only with one of the three levels of standing, the injury thing. That's where the nexus analysis comes in, at the injury prong. What we still have to deal with, since we're beyond the pleading stage, is causation and redressability. And when you examine causation and redressability in the context of the district court's order, we see that there's a disconnect between the order and causation and redressability, even if you have the injury prong met, which I submit that you don't because the nexus is no longer satisfied under Winn. Counsel, let me ask you this. What has the district court ordered you to do that you are bound by at this point? As I understood it, both parties made motions to dismiss, and they said they granted theirs, didn't grant yours, but the case has been dismissed as to you, hasn't it? Well, only in a very theoretical sense. The dismissal I seek would literally end the case. Their quote-unquote dismissal perpetuates the case for at least the next seven years. But against you or against the state? That is, if a court does something wrong between A and B, C can't come in and say you did it wrong. And if you're dismissed out of the case, the order requires the state to treat my client differently than everyone else for discriminatory reasons, we submit, and subjects us to that special punitive treatment for the next seven years. Well, it subjects the state to it. I mean, isn't your problem or isn't your remedy to sue the state? In other words, again, if a court makes an order between A and B, for example, let's say that between A and B, they say that the state of Kentucky will no longer grant tobacco licenses of some sort. And if that puts the state in a position of damaging you, then you sue the state. I would agree with Your Honor if this was a private agreement just between the state and the plaintiffs. But this has the imprimatur of the court. This has ongoing monitoring by the court, ongoing monitoring by our adversary in this very litigation. We don't get to participate in the state's program on equal terms, and it's because of the district court's order that that's true, not just a private agreement between the plaintiffs and the state. So, for example, what happens is that without any shred of evidence that there's anything amiss, all of Sunrise Records, not anybody else's, just Sunrise, all of our records are automatically turned over to the plaintiffs, our adversaries in this litigation. Your records are things that are in the hands of the state, not of you personally. Does this order say you shall give records to somebody? It's records that we would be doing in the ordinary course of business, providing to the state. If you got the business. If we got the business, but that's part of the problem. Because we're under that special kind of scrutiny, that regime of scrutiny that no other provider is under, then the state obviously has a tremendous incentive not to give us the business. I mean, what issue are we talking about right now? The propriety of the order. We're not talking about standing right now. That's okay. I'm raising the question, and maybe it's not a good question, but is to what extent are you harmed by the fact that the case has been dismissed as to you? I think we're harmed in three ways. One, our records have to be maintained in a way to satisfy our adversaries in this litigation. Nobody else has. If you contract with the state. Yes. I mean, this goes to my analogy is if a court, for whatever reason, somebody comes in and says tobacco are bad, we're going to sue the individual people in Logan County, and for whatever reason a court says, okay, the state will grant no licenses in Logan County. If the state agrees to that and that violates the law, they sue the state. They can't interfere with a court case to which they're no longer a party. Well, we can because we have been of necessity a party to this case for the last 15 years. The plaintiffs themselves made us a party to this case because they knew we were indispensable. They knew that any relief they sought against the state would directly impact us. That's why we have been in this case from day one and provided the laboring oar for its defense. What went on for 14 years in this case? I'm sorry? I mean, this case went on for 14-something years? It was filed in 2000. And what went on for all that time before you filed your motion for summary judgment? Well, there were two appeals. Oh, sure. You just answered the question. Sure. It's our fault. Not your fault, but it was pending in the Supreme Court for two years. I understand. But the problem, of course, is that we don't have an objective, neutral, independent assessment of our performance by the state or an independent third-party monitor. It's our adversaries in 15 years of litigation that are our overseer. I see my time is up. Thank you. You'll have your time for rebuttal. Thank you. Thank you. May it please the Court. I'm Stanton Jones. I represent the plaintiffs, and I'm also arguing today on behalf of the Commonwealth defendants. Plaintiffs and the Commonwealth defendants settled the only claim in this case and voluntarily dismissed the case, bringing an end to more than a decade of contentious and complex litigation. Plaintiffs and the Commonwealth are fully committed to implementing the settlement, which already has been in effect for nearly a year since all private child care providers across the state of Kentucky, including Sunrise, executed the modified PCC agreements last year, including the new terms described in the settlement. The settlement, we believe, is preventing and will continue to prevent the improper use of state funds to aid the religious indoctrination, coercion, and proselytization of children in the Commonwealth's custody. I understand. Okay. And that kind of speaks to redressability, I suppose. But, I mean, let's kind of go to some of the other issues relating to whether this is a consent decree, whether it's fair, et cetera. I can sympathize with Sunrise's frustration that they have these accusations made against them about improper proselytizing, et cetera. They actively dispute, vigorously dispute those allegations over litigation that has run for 14-odd years. They fully brief a motion for summary judgment, which they think would vindicate them and spare them the sorts of burdens that they have now. A settlement, they are a party to this case. A settlement is reached between the plaintiffs and the state, which over their objection, over Sunrise's objection, which singles out Sunrise for what they say are onerous and sort of almost humiliating reporting conditions. The ACLU, I believe, starts issuing press releases saying how great it is that Sunrise has more or less been put in its place. And now, and they had never, they never had an answer, they were never able to get an answer on the merits about whether their conduct was wrong. And now they're suffering reporting harm, and they've suffered reputational harm, which is perpetuated every time somebody gets up and says we've stopped the wrongdoing. Why isn't that, why doesn't that raise a fairness issue that the district court perhaps should revisit a little more closely? So you raised a number of points that I can address. First of all, the litigation was longstanding, both because of the multiple lengthy appeals and the time that the case was pending at the Supreme Court. The magistrate judge also reluctantly concluded, were his words in a 2008 order, that Sunrise had, quote, adopted a litigation strategy of minimizing disclosures and maximizing objections, and of carefully conceived delay, consistently resisted disclosing virtually any information in discovery, and engaged in a pattern and practice of unnecessary delay. So I don't think it's fair to say that the litigation went on for a long time, and now Sunrise is entitled to continue forcing us to litigate it under those conditions. The, you mentioned the fact that the settlement agreement, in one, I think, relatively minor way, does impose a, does speak to Sunrise in a way that's not shared with all providers. All of the substantive requirements of the settlement agreement, all of the modifications to the PCC agreement, all of the monitoring, the creation of documentation and monitoring by the Commonwealth, all of those provisions are common to all private child care providers across Kentucky, including Sunrise. The only, the only very narrow issue that's specific to Sunrise is that for a limited period, the Commonwealth will share with plaintiffs' counsel the monitoring materials that the Commonwealth receives from Sunrise. Could that be attacked by a lawsuit by the other side? Here the state has agreed, in effect, to create a disadvantaged class of one. Is there any reason that they couldn't bring that suit against Kentucky? I haven't ever heard that anyone has considered it, so I haven't given thought to it. I don't think that the suit would have legs, but they certainly could try, and I think that that would certainly be a more appropriate avenue to object to the Commonwealth sharing that information with the plaintiffs' counsel than the objections that they've raised here. It seems to me you could certainly make a decent privacy argument, even, that you have something involving small children where you have people dealing with the state and then the state turns it over to a private party. So I'm not their litigation counsel, but I'm trying to get the procedural posture here. Do you, you know, everybody seems to want to fight about the big issue. Maybe I'm the only one that's, but do you make a point that they really don't have any dog in this fight anymore? I mean, people do consent decrees that are wrong and evil, but not everybody can sue about them in the same case. Or is that, is this just something that's a frolic of mind? No, that's correct. I don't, I think it's fair to say Sunrise doesn't have a dog in this fight. This was plaintiffs' establishment clause claim, which because the Commonwealth is the only state actor in the case, the claim was brought only against the Commonwealth. There are no other claims in the case, no claims directly against Sunrise, no claims brought by Sunrise. Why were they brought in as a necessary defendant then? They were named as a Rule 19 party and they never sought to get out of the case on the theory that they weren't a Rule 19 party, a necessary party. One of the forms of relief sought in the complaint was to block the state's funding of Sunrise, and so that was the reason that they were named, and again, they never contested that they were. But, I mean, surely, de facto, they are, I mean, they are affected by this settlement agreement slash order. I mean, they, de facto, I mean, they have to comply. They have to do this reporting stuff. They have to do these exit interviews, etc. They have to do all that stuff or else they're out of business. They have to do those things because they entered into the modified PCC or C agreement with the Commonwealth. Again, the settlement agreement doesn't impose any requirement. As Judge Simpson recognized, it doesn't impose any requirement on Sunrise or any other private child care provider in Kentucky. Sunrise, like all other PCCs throughout the entire state, needs to comply with its government contracts, its PCC agreements with the Commonwealth. So it's your position that all of the record keeping and information gathering in the form of interviews and so on that is described specifically as to Sunrise in the settlement agreement is already, already, Sunrise is already required to keep and gather that information and provide it to the state pursuant to its own contract with the state. Is that what you're saying? Just to be clear, yes, that is true for Sunrise. That is also true equally. For everybody. Only equally for all. Okay, well, that's helpful. That's the only difference. The only difference. The state has to cough it up. The state is going to give those materials automatically to us. Also, it's only true, has only been true for the last year or so in response to the settlement agreement. In other words, this is, when you say everybody's had to do this, it's not the same things that they had to do before the settlement agreement. You keep referring to the modified PCC. The modified PCC was modified because of the consent decree. Yes, that's correct. Okay, or the settlement agreement. So, okay. I mean, that's, both of these things are, I was less clear on them. So, I mean, then the consent decree, one could argue the consent decree does create these, have a role in creating the obligations that they're complaining about. The settlement agreement, yes, it required the Commonwealth to make various changes to its procedures. Okay. Providing care to children through private providers, including to make modifications to the PCC agreement. The Commonwealth, in between the time when the settlement agreement was executed in 2013 and last spring, the Commonwealth made those changes to the PCC agreements, made various other changes, updating databases, preparing exit interview forms, questionnaires for social workers to conduct annual interviews with children about their religious experience at private child care providers, and various other documentation. And then, last spring, all private child care providers statewide executed the new PCC agreement, and it became effective last July. Are there any providers that have refused to do that and say you don't have the right to ask us for that, for example? My understanding is that there was one relatively small private child care provider last year that did not execute the modified PCC agreement. I don't know specifically what the reason was, but there was one, a smaller one. They've not brought any litigation over it, as far as you know? To my knowledge, no. This thing sure looks like a consent decree. I mean, we have an agreement between the parties, one of whom is a state that is transformed into a court order. There are reporting requirements. Yes, it says it's not a consent decree, but we're not bound by that. And yes, it says you can't bring a motion for contempt, but I think that you could bring a motion for specific performance, perhaps, and if that is denied or granted and they don't perform, then you can move for contempt then, perhaps. I mean, I see that as not terribly difficult to get around, probably. So why isn't this, in fact, a consent decree? First and foremost, Judge Kethledge, the issue is really academic because even if you were to treat the settlement agreement and the court's order of dismissal, incorporating it as a consent decree or a de facto consent decree or tantamount to a consent decree, as Sunrise has described it, Judge Simpson already considered the factors for court approval of a consent decree, exercised his discretion, and properly so, to approve it and to incorporate the settlement into the order of dismissal. He addressed the various standards under the Local 93 case relating to whether the settlement is a consent decree. Okay. No, I understand. I understand that argument. Let's set that aside. You know, you may or may not be right about the import of this sort of alternative holding. Why isn't it a consent decree? So it isn't a consent decree for a couple of reasons. First, a key feature of consent decrees is that violations of them are violations of a court order subject to contempt. Okay. We have the violation of a court order part because it is an order. This court order, by virtue of the settlement agreement, explicitly disclaims any contempt remedy, civil or criminal, for a violation. The parties' sole—the Commonwealth defendants and the plaintiffs' sole purpose in asking the district court to incorporate the settlement into the order of dismissal was simply to preserve ancillary enforcement jurisdiction under the Kekkonen line of cases. Ancillary enforcement jurisdiction to allow the parties, in the event of a dispute over the settlement agreement, to bring that dispute into federal court as opposed to taking the dispute to state court, which is what you would otherwise have to do for just a run-of-the-mill breach of settlement contract. So I guess—I mean, what happens? Let's say they just—Kentucky says, you know what? We're done giving you the Sunrise Records. We think it's wrong. We think it's violation of equal protection. We're done. What happens? Walk me through what would happen then. So first, the settlement agreement sets forth a series of mandatory informal dispute resolution procedures, beginning with notice and an opportunity to cure, followed by mandatory mediation. This is between the state and who? The ACLU? This is between the state and the plaintiffs, the parties to the settlement agreement. What if that doesn't work because the state is adamant? If that doesn't work, the settlement agreement provides for exclusive jurisdiction in the Western District of Kentucky for the aggrieved party to bring a motion to enforce a settlement agreement and limits relief, precludes any sort of contempt sanction, and limits relief exclusively to specific performance of the settlement agreement. So they get a specific performance order. The state refuses to perform. What happens? Then the state would be in contempt of a court order. It wouldn't be in contempt of the court's order of dismissal in this case. It would be in contempt of a court order specifically enforcing a contract just the way that any party that breaches a contract and refuses a court order. I guess I'm just suggesting this thing is set up to function no different from a consent decree. You have to go through the arbitration and mediation stuff. I grant you that. But otherwise, this business about no contempt, it's a fiction. I mean, it's just not really the way this is going to work. It works just like a consent decree, right? I see my time is up. That's okay. Sure, of course. So I think it's different in another way also, which is that consent decrees typically involve some sort of ongoing active judicial monitoring or supervision. This agreement and order doesn't contemplate any sort of active role. The district court's role is limited exclusively to hearing a motion brought by one of the parties for breach of the settlement agreement and entering an order of specific performance. I think that's different than most consent decrees. In addition to eliminating the opportunity to pursue contempt. And again, back to our most important point on this, is just that the question of whether it is a court-enforceable settlement or a consent decree or is that academic because we meet the standards. Although isn't the, and help me here if I'm wrong, that in some ways isn't the oversight by your clients likely to be more direct and vigorous than in a consent decree where the court's oversight, they may or may not have things to do, and then you have to go to court initially to try to get oversight. Here, by the agreement, you have direct oversight over what the state is doing. I don't know if I would presume to say that we will do a better job than a court would do. I didn't say better. I said more vigorous. We do intend to review the materials that we receive from the Commonwealth and to enforce a settlement agreement if the need arises. I'm hopeful that it won't. Thank you. Okay, thank you. We have three minutes for rebuttal. Mr. Schneller. Thank you, Your Honor. Let me start with this consent decree. Private parties, including the state, don't have the ability to dictate what the court's jurisdiction is, dictate limitations on the court's jurisdiction, and that's what they're trying to do. They're trying to have the benefits of a court order and then constrain the way in which the court might enforce that order. But it's the court's own order, the court's own surrendering of its contempt authority, nominally at least. Agreed, and that's why we're here for this court to tell Judge Simpson that he can't do that. With all due respect to Judge Simpson . . . Why can't he do it? Because he can't restrain his own jurisdiction to the extent that he has it. I mean, as you were saying, Judge Ketledge, the only way that that order actually can operate in any kind of effective way other than just by the will of the parties to the agreement is for the court to have some kind of teeth, and it clearly is intended to have some kind of teeth. That's why there is a procedure for the parties to go back before the magistrate judge and then ultimately to the district judge to have it implemented. That's the whole reason why this is a court order rather than a private settlement, because if it was a private settlement, they'd be going back into state court with some different judge just on a routine breach of contract matter. There wouldn't be any basis for federal jurisdiction. So if we said it was a consent decree because it functions like one, what then should we do after that in your view? Well, then you have to evaluate it for fairness purposes, and that analysis deals with the pendency of a summary judgment motion for 20 months that was unopposed for 20 months. But by the way, all the defendants filed. It wasn't just us. The state defendants also had a pending summary judgment motion for 20 months at the time this was done. So, I mean, what is – I know you've said it. I'm just trying to find it. I mean, what ultimately are you asking us to do, invalidate the order? Vacate the order, and in my judgment, the case should be remanded for dismissal for lack of subject matter jurisdiction, lack of standing. That's a separate issue. But assuming you don't reach that, then the case should go back for a ruling on the summary judgment motion, which dealt with the merits of the funding claim, not the standing issue. There's no need for any further discovery. There's no need for any further litigation. There's no need for anything. In fairness to the plaintiff, they ought to be given an opportunity to respond to the summary judgment motion since it was short-circuited despite its pendency for 20 months. But it would be remanded for disposition of the summary judgment motion that's been pending for 20 months by both sets of defendants, including the state. And I think that's the appropriate relief here. I'm sorry, my time's up. No, go ahead. I was going to say that the notion that we have free will about this so-called new PCC is ridiculous because we don't have the right to negotiate the terms of the contract. That's preordained by this order. We don't have any ability to do anything other than what's in that order. Thank you very much for your time today. Thank you. That case will be submitted, and the remaining cases will be submitted on briefs, and the clerk may adjourn the court.